2001 UT 13

Jacqueline BOOTH and Donald Tevini, Plaintiffs and Appellants,

v.

ATTORNEYS' TITLE GUARANTY FUND, INC., a corporation, William L. Benge, Moab Travelodge Limited Partnership, and Charles Critchlow, Defendants and Appellees.

No. 990551.

Supreme Court of Utah.

Feb. 9, 2001.

---

J. Randall Call, Salt Lake City, and James L. Dawson, San Jose, CA, for plaintiffs.

Theodore E. Kanell, Mark J. Williams, Salt Lake City, for defendants.

RUSSON, Associate Chief Justice:

¶1 Jacqueline Booth and Donald Tevini appeal the seventh district court's grant of

summary judgment in favor of Attorneys' Title Guaranty Fund, Inc. ("ATGF"), William Benge, and Charles Critchlow. The court held that title to the Moab Travelodge motel ("Travelodge") was marketable, Booth and Tevini had sustained no injuries, and the statute of limitations precluded any claim of fraud. We affirm.

## BACKGROUND

¶ 2 Richard Rose and Robert Rudl were general partners of the Moab Travelodge Limited Partnership ("MTLP"). The partnership was formed in 1980, and MTLP's primary asset was the Travelodge in Moab, Utah. Rose acted as the managing general partner of MTLP from its formation.[1]

¶ 3 Rudl filed a voluntary petition for chapter 7 bankruptcy[2] in California in 1983 or 1984 and thereafter became inactive as a general partner of MTLP. At no time did Rudl's bankruptcy trustee act as a general partner of MTLP.

¶ 4 On February 13, 1985, Rose filed for personal bankruptcy in California under chapter 11.[3] In October 1989, this proceeding was involuntarily converted to a chapter 7 proceeding, and the California bankruptcy court appointed a trustee.

¶ 5 On June 6, 1985, after Rose had filed for personal bankruptcy in California, MTLP filed for chapter 11 bankruptcy in Utah. As part of its bankruptcy proceedings, MTLP filed an amended disclosure statement to its bankruptcy plan, designating Rose as manager of the ongoing concern and providing that Rose be paid $1000 per month as compensation for this responsibility.

¶ 6 The Utah bankruptcy court filed an order confirming the MTLP bankruptcy plan on December 14, 1986. The order provided: "Upon the entry of the Order of Confirmation the Debtor [MTLP] shall be entitled to manage its affairs without further order of the Court." The confirmation order also stated: "The Court shall retain jurisdiction of this Chapter 11 case pursuant to and for the purposes set forth in 1127(b)[4] of the Code .... (c) Order a sale of assets. (d) Supervise such other matters as may be set forth in the Order of Confirmation."

¶ 7 In the summer of 1989, Booth and Tevini, both California residents, visited Rose in Moab. Booth knew Rose and Rudl and had lent $40,000 to MTLP in 1982. That loan was secured by a trust deed on the Travelodge. Booth acknowledged in her deposition that because she was a creditor of MTLP, she had previously received a notice of the MTLP bankruptcy by mail. Booth also stated in her deposition that she had started receiving monthly payments on the note about one and one-half years before MTLP filed for bankruptcy, and the payments continued after the filing.

¶ 8 While visiting Moab, Booth and Tevini decided to purchase the Travelodge. Booth and Tevini were aware that Rose was in personal bankruptcy at that time, but Booth claimed Rose had told her MTLP was no

---

1. To eliminate any issues that had been raised concerning Rose's authority to act as general partner of MTLP, a resolution of all the MTLP partners was later adopted, in October 1994. The resolution ratified all the actions of Rose as managing general partner of MTLP from the time of its formation. The resolution also specifically ratified Rose's authority to act on behalf of MTLP from the time MTLP filed for bankruptcy, and in particular, it ratified his actions in the sale of the Travelodge to Booth and Tevini.

2. Chapter 7 bankruptcy is a liquidation proceeding that provides for a trustee to liquidate all a debtor's assets that have nonexempt equity. *See* 9 Am.Jur.2d *Bankruptcy* § 38 (1991).

3. A chapter 11 bankruptcy is a rehabilitative form of bankruptcy in which a debtor is allowed "to retain assets, to restructure most debts, and to repay obligations over an extended period of time" in an attempt to preserve interests and offer at least partial repayment of all obligations. *Id.*

4. The United States bankruptcy code provides:

The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

11 U.S.C. § 1127(b) (1994).

longer in bankruptcy. In August 1989, Tevini submitted an earnest money sales agreement to MTLP to purchase the Travelodge for $1,725,000 subject to a tax deferred exchange involving other property Tevini planned to sell.[5] Rose signed the agreement on behalf of MTLP on September 3. Tevini then arranged for Lloyd Kendall at LAM in California to act as the accommodator in the tax deferred exchange, and Rose arranged for ATGF to serve as the escrow agent, as well as to provide title insurance.

¶ 9 In preparation for the closing, ATGF and LAM exchanged documents. It is not certain exactly which documents were sent and received, but all parties agreed that the cover page of the ATGF title commitment was sent to and received by LAM. Kendall, Booth, and Tevini all acknowledged having seen the title commitment cover page before completing the closing. At the bottom of the cover page, in bold print, was the statement: "This Commitment must contain Schedules A and B and be duly validated by this signature." It was signed by William Benge as authorized agent.

¶ 10 Schedule B of the title commitment listed the exceptions to title such as judgments, liens, and bankruptcies. Kendall claimed Tevini had made him aware that there may be a bankruptcy issue. Therefore, Kendall claimed that when he did not receive schedule B of the title commitment, he advised Booth and Tevini that they should wait to receive and review that information before they closed on the Travelodge. Booth and Tevini admitted that they knew they did not have the entire title commitment prior to closing.[6] Nevertheless, without schedule B, on January 10, 1990, Booth and Tevini closed on the first portion of the tax deferred ex-

change.[7] A promissory note was placed in escrow with First Western National Bank so that payments could be received on the note and disbursed pursuant to the terms of the escrow agreement.

¶ 11 Sometime in January 1990, shortly after closing on the first portion of the tax deferred exchange, Booth and Tevini went to the office of John Richardson, the case administrator for the trustee in Rose's personal chapter 7 bankruptcy in California, to discuss the sale of the Travelodge.[8] Richardson allegedly told Booth and Tevini that the sale could not take place unless Rose's trustee had been notified. Nevertheless, Tevini claimed that he and Booth gave Richardson all the documents regarding the sale to review and Richardson said he would get back to them. Tevini claimed that approximately one week later, Richardson called and told him that Tevini and Booth had apparently paid fair market value for the Travelodge and that the trustee approved the sale.

¶ 12 In April 1992, MTLP's bankruptcy attorneys sent a letter to the Travelodge regarding the closure of MTLP's chapter 11 bankruptcy. Booth and Tevini saw this letter when they picked up their mail at the Travelodge in May 1992. Tevini claimed that shortly thereafter, he and Booth contacted ATGF and expressed concerns regarding marketability of the Travelodge's title.

¶ 13 The Utah bankruptcy court closed MTLP's bankruptcy case by entry of a final decree on August 16, 1992. Booth and Tevini eventually made a claim against ATGF under their title policy on the Travelodge. They alleged they had suffered damages because title to the Travelodge was clouded due to the fact that approval for the sale had

---

5. The exchange was a two-step process conducted pursuant to I.R.C. § 1031(a). First, in exchange for a promissory note, Rose granted fee title of the Travelodge to Lawyers Asset Management ("LAM"), and Tevini granted to LAM fee title of the other property he planned to sell. All titles were vested in LAM. Thereafter, LAM transferred title of the Travelodge to Tevini and title of the other property to a purchaser.

6. Booth was not new to commercial real estate transactions. She testified in her deposition that she had previously been involved in two other real estate purchases. In each, she acted as the

sole buyer in the purchase of a small apartment building.

7. LAM completed the last portion of the exchange on May 6, 1991, by delivering a quitclaim deed to Booth and Tevini.

8. The record is unclear as to what exactly prompted this visit. Tevini's deposition alludes to a conversation that took place between Booth and Rose's ex-wife and eventually led to Tevini and Booth contacting Richardson.

never been acquired from the California court with jurisdiction over Rose's chapter 7 bankruptcy. They also claimed that Rose did not have the authority to act for MTLP because he was in chapter 7 bankruptcy when he executed the sale.

¶ 14 The ATGF title insurance policy insured Booth and Tevini against loss or damage sustained or incurred, up to $1,725,000, as a result of "1. Title to the estate or interest described in Schedule A being vested other than as stated therein; 2. Any defect in or lien or encumbrance on the title; 3. Unmarketability of the title; and 4. Lack of a right of access to and from the land." In addition, schedule B provided the exceptions that indicated the chain of title. However, despite claims that they could not obtain refinancing for the Travelodge, Booth and Tevini admitted that they never made any written application to any lender for any refinancing.

¶ 15 To resolve the question of whether the Travelodge title was marketable, ATGF, Booth, and Tevini filed a joint motion to reopen the MTLP chapter 11 bankruptcy case in May 1994. They asked the Utah bankruptcy court to issue an order holding that the sale of the Travelodge was authorized under the terms of MTLP's confirmed bankruptcy plan. Booth and Tevini filed a supplemental motion, and MTLP filed an objection to the motion to reopen. Once the case was reopened, ATGF moved for a finding that Rose was authorized to execute the sale and for the court's approval of the sale. In June 1995, the Utah bankruptcy court concluded that pursuant to its bankruptcy plan, MTLP was entitled to manage its affairs without further order from the court; the provision of the plan that concerned continuing jurisdiction of the bankruptcy court to order a sale of assets was permissive, not mandatory; and bankruptcy court approval was not necessary for MTLP to sell the Travelodge.

¶ 16 In February 1995, Booth and Tevini filed a complaint in Grand County, Utah, naming ATGF, Rose, MTLP, Benge, Critchlow (issuer of the title policy), and others as defendants. The complaint alleged breaches of contract and warranties; fraud and conspiracy to defraud; breach of fiduciary duty and constructive fraud; violation of the implied covenants of good faith and fair dealing; negligence; and action to quiet title.

¶ 17 Defendants took the position that it was unnecessary for Booth and Tevini to seek to quiet title, and asserted that there had been no valid claim under the title policy nor any defect in the title to the Travelodge. Defendants did not oppose the motion to quiet title, and in December 1995, the district court ordered judgment quieting title in Booth and Tevini. However, the district court specifically did not make any finding with regard to the necessity for bringing the action to quiet title. In addition, the district court reserved unto the individual defendants any and all defenses they may have had relative to any of the other claims filed in the complaint.

¶ 18 On April 1, 1996, Booth and Tevini filed an amended complaint. This complaint alleged (1) breach of contract against Rose and MTLP; (2) fraudulent misrepresentation against Rose and MTLP; (3) breach of contract against ATGF; (4) fraudulent concealment against ATGF and Benge; (5) breach of the implied covenants of good faith and fair dealing against Rose, MTLP, ATGF, Benge, and Critchlow; and (6) negligence against Rose, MTLP, ATGF, Benge, and Critchlow.

¶ 19 In November 1996, Booth and Tevini stipulated that all claims against Rose and MTLP had been compromised and settled. Therefore, the district court ordered all claims against Rose and MTLP dismissed with prejudice. This left the claims of (1) breach of contract against ATGF; (2) fraudulent concealment against ATGF and Benge; (3) breach of the implied covenants of good faith and fair dealing against ATGF, Benge, and Critchlow; and (4) negligence against ATGF, Benge, and Critchlow.

¶ 20 In June 1998, ATGF, Benge, and Critchlow moved for summary judgment. Defendants first argued that Booth and Tevini had no cognizable cause of action against either Benge or Critchlow because both Benge and Critchlow were only acting as agents on behalf of ATGF, the disclosed prin-

cipal. Therefore, defendants argued that all charges against Benge and Critchlow should be dismissed. Furthermore, defendants argued that summary judgment was proper because Booth and Tevini could not support a claim for loss under the title insurance policy as a result of unmarketability of the Travelodge title. In addition, defendants asserted that Booth and Tevini could not support a claim of fraudulent concealment because (1) there was no proof of active concealment and (2) Booth and Tevini knew they should have waited for a complete copy of the title commitment before closing.

¶ 21 At the time of oral argument, the court and all parties agreed that no contractual liability existed for Benge and Critchlow. Therefore, the court dismissed the claim for breach of the implied covenants of good faith and fair dealing against Benge and Critchlow.

¶ 22 After additional briefing, the seventh district court issued its memorandum decision and concluded that the Travelodge title was marketable as of the closing date. The court based its decision on the finding that a reasonably prudent person familiar with the facts of the case and apprised of the question of law would accept title in the ordinary course of business.

¶ 23 The district court also found that Booth and Tevini had not presented legally sufficient evidence to raise a question of fact as to any injury sustained. Therefore, the court concluded that no claim had been made for contractual damages, tortious damages, or violation of good faith and fair dealing.

¶ 24 Finally, the court concluded that as of the closing date, Booth and Tevini either knew the facts or should have known the facts upon which they alleged fraud or misrepresentation and therefore were precluded from bringing such claims by the statute of limitations. Defendants' motion for summary judgment was granted, and all plaintiffs' claims were dismissed with prejudice. On June 17, 1999, Booth and Tevini appealed to this court.

¶ 25 On appeal, Booth and Tevini first argue that a genuine issue of material fact existed as to the marketability of the Travel-odge. They claim that title to the Travelodge was not marketable because a Utah bankruptcy court order was necessary before selling MTLP's primary asset. In addition, they assert that Rose was not authorized to represent MTLP in light of his personal bankruptcy and that the California bankruptcy court's approval was necessary for the sale. Booth and Tevini also aver they suffered loss and damages due to the unmarketability of the title.

¶ 26 In addition, Booth and Tevini allege that Benge and ATGF breached their fiduciary obligations by fraudulently concealing schedule B of the title commitment and the letter of notification regarding conversion of Rose's chapter 11 bankruptcy to a chapter 7 bankruptcy. Booth and Tevini also argue they did not discover the facts giving rise to this claim until after February 1992, three years before they filed their initial complaint. Therefore, they argue that their claim is not precluded by the statute of limitations.

¶ 27 Defendants counter that Booth and Tevini failed to establish a genuine issue as to whether they suffered any loss or damage by reason of the unmarketability of the title and therefore the court was correct in granting summary judgment. In addition, defendants argue that the title was marketable because the California bankruptcy court did not have jurisdiction over the MTLP partnership so that the court did not need to approve MTLP's sale of the Travelodge. They also argue that Rose had the authority to act on behalf of MTLP despite his personal bankruptcy and that an order from the Utah bankruptcy court allowing sale of the Travelodge was unnecessary. Furthermore, defendants argue that plaintiffs' claims for fraudulent concealment are barred by the three-year statute of limitations because reasonable diligence at the time of closing would have led to discovery of the relevant facts of the alleged fraud.

### STANDARD OF REVIEW

¶ 28 Summary judgment should be granted only if there has been a showing "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Utah R. Civ.

P. 56(c). In reviewing the district court's grant of summary judgment, "we review the court's legal decisions for correctness, giving no deference, and review 'the facts and inferences to be drawn therefrom in the light most favorable to the nonmoving party.'" *J.R. Simplot Co. v. Sales King Int'l, Inc.,* 2000 UT 92, ¶ 13, 17 P.3d 1100 (quoting *Dairy Prod. Servs., Inc. v. Wellsville,* 2000 UT 81, ¶ 15, 13 P.3d 581).

## ANALYSIS

### I. CLAIM FOR DAMAGES UNDER ATGF POLICY

¶ 29 Booth and Tevini claim they were told by lenders that they could not get refinancing on the Travelodge due to problems with the title. They also claim that a prospective purchaser insisted on a $250,000 discount to fix the title problems. They claim that they suffered damages due to the unmarketability of the Travelodge title. Booth and Tevini claim the title is unmarketable for three reasons: (1) MTLP did not have an order from the Utah bankruptcy court before selling the Travelodge; (2) the California bankruptcy court handling Rose's chapter 7 bankruptcy had not given approval for the sale of the Travelodge; and (3) Rose did not have the authority to act for MTLP due to his chapter 7 bankruptcy.

¶ 30 Defendants counter that (1) MTLP had been given the authority to manage its affairs without further order from the bankruptcy court and that court confirmed this with its ruling in June 1995; (2) the California bankruptcy court did not have jurisdiction over the assets owned by MTLP and MTLP's assets were not included in Rose's bankruptcy estate; and (3) Rose had been authorized to manage MTLP's affairs pursuant to MTLP's confirmed bankruptcy plan, the MTLP partners ratified that Rose had been the managing general partner since MTLP's formation, and Utah Code Ann. § 48–1–13 (1998) provided that Rose had authorization by estoppel.

¶ 31 Title insurance is defined as the insuring, guaranteeing, or indemnifying of owners of real or personal property or the holders of liens or encumbrances on that property, or others interested in the property against loss or damage suffered by reason of liens or encumbrances upon, defects in, or the unmarketability of the title to the property, or invalidity or unenforceability of any liens or encumbrances on the property.

Utah Code Ann. § 31A–1–301(91) (Supp. 2000). A commitment for title insurance is "'no more than a statement of the terms and conditions upon which the insurer is willing to issue its title policy.'" *Culp Constr. Co. v. Buildmart Mall,* 795 P.2d 650, 653 (Utah 1990) (quoting *Lawrence v. Chicago Title Ins. Co.,* 192 Cal.App.3d 70, 237 Cal.Rptr. 264, 268 (1987)); *see also Gildea v. Guardian Title Co. of Utah,* 970 P.2d 1265, 1271–72 (Utah 1998).

¶ 32 A purpose for obtaining title insurance is to guarantee a certain position in the chain of title. *See Culp,* 795 P.2d at 654. Therefore, the title insurance company will defend against adverse claims and indemnify the holders for any loss or damages actually sustained due to problems such as unmarketability of the title. If Booth and Tevini actually sustained damages as a result of unmarketability of the Travelodge title, they are entitled to be indemnified for that loss. Therefore, we first address the marketability of the Travelodge title, and we need address the issue of damages only if the title is found to have been unmarketable.

¶ 33 "Marketable title is one that may be 'freely made the subject of resale' and that can be sold at a 'fair price to a reasonable purchaser or mortgaged to a person of reasonable prudence as security for the loan of money.'" *Kelley v. Leucadia Fin. Corp.,* 846 P.2d 1238, 1243 (Utah 1992) (quoting 77 Am.Jur.2d *Vendor and Purchaser* § 131, at 313–14 (1975)).

¶ 34 Booth and Tevini first claim that the Travelodge title was unmarketable because MTLP was involved in a chapter 11 bankruptcy proceeding at the time of closing and the Utah bankruptcy court had not authorized the sale. A chapter 11 bankruptcy proceeding is a rehabilitative form of bankruptcy. *See* 9 Am.Jur.2d *Bankruptcy* § 38 (1991). As such, the bankruptcy code was

written contemplating that in a chapter 11 proceeding, the current management would continue to manage its property and operate its business without appointment of a trustee.[9] *See id.* §§ 271, 343. In fact, the specific rights, powers, and duties of the manager of a business in chapter 11 bankruptcy include "us[ing], sell[ing], or leas[ing] property." *Id.* § 346, at 358.

¶ 35 In MTLP's chapter 11 bankruptcy, Rose, who had been the managing partner, was confirmed by the Utah bankruptcy court as manager of MTLP's ongoing business concerns. Upon confirmation of the MTLP bankruptcy plan, the court ordered that MTLP was "entitled to manage its affairs without further order of the Court." As we have noted, the bankruptcy code contemplates that in managing its affairs, Rose, as manager, was entitled to sell the Travelodge. The court's confirmation order authorized Rose to sell the Travelodge without permission from the bankruptcy court. The Utah bankruptcy court confirmed this in its holding in 1995. Therefore, MTLP's chapter 11 bankruptcy did not affect the marketability of the Travelodge title.

¶ 36 Booth and Tevini next claim that because Rose was in bankruptcy, permission from the California court with jurisdiction over Rose's chapter 7 bankruptcy was necessary to sell the Travelodge.

Since a partnership is a legal entity separate from the partners themselves, partnership assets will be excluded from a debtor-partner's estate. Where the [bankruptcy] debtor is a partner in a partnership, the debtor's estate will instead include the debtor's interest in the partnership, that is, the right to receive the debtor's share of any profits generated by the partnership.

*Id.* § 1004; *see also In re Newman,* 875 F.2d 668, 670 (8th Cir.1989).

¶ 37 As a general partner in MTLP, Rose had an interest in MTLP's assets.

However, MTLP's assets were excluded from Rose's bankruptcy estate. Instead, Rose's bankruptcy estate included Rose's interest in MTLP—the right to receive Rose's share of any profits generated by MTLP. Therefore, the California bankruptcy court had no jurisdiction over the Travelodge, which was MTLP's asset. Rose's chapter 7 bankruptcy estate did not include the Travelodge, but instead included only Rose's share of any profits generated by the sale of the Travelodge. As a result, consent by the California bankruptcy court was unnecessary, and the lack thereof had no effect on the marketability of the Travelodge title.

¶ 38 Finally, Booth and Tevini argue that due to his bankruptcy, Rose did not have the authority to act for MTLP. They rely on sections 48–1–28(5) and –32(3)(b) of the Utah Code for their argument.[10] Section 48–1–28(5) provides that a partnership is dissolved upon the bankruptcy of any partner of a partnership. Section 48–1–32(3)(b) further provides that upon dissolution of a partnership, the partnership is not bound by the acts of a bankrupt partner.

¶ 39 MTLP's articles for limited partnership provide that "[t]he Partnership shall not be dissolved by the death, withdrawal, bankruptcy, or adjudication of insanity or incompetency of an individual General Partner." Partners may make any agreement between themselves so long as it is not in violation of public policy or the common law, and their agreement generally controls as to matters between them. *See* 59A Am.Jur.2d *Partnership* § 1279, at 875 (1987); *see also, e.g., Knutson v. Lauer,* 627 P.2d 66, 68 (Utah 1981) (holding that general rule concerning remuneration applies unless partnership agreement or any other agreement between partners provides otherwise); *Jackson v. Caldwell,* 18 Utah 2d 81, 85, 415 P.2d 667, 670 (1966) (holding that general rule concerning good will applies unless parties have provided otherwise in partnership agreement).

---

9. Appointment of a chapter 11 trustee is possible but rare. *See* 9 Am.Jur.2d *Bankruptcy* §§ 271, 343 (1991).

10. MTLP was formed as a limited partnership in 1980. When Rose declared bankruptcy in 1985, the sections pertaining to general partnerships, Utah Code Ann. §§ 48–1–1 to –40 (1982), applied "to limited partnerships except in so far as the statutes relating to such partnerships are inconsistent herewith." Utah Code Ann. § 48–1–3.

Therefore, Rose's bankruptcy did not cause the dissolution of MTLP, and the statutes Booth and Tevini relied on are inapplicable.

¶ 40 Rose was the only acting general manager of MTLP. Even after declaring personal bankruptcy, Rose was confirmed by the Utah bankruptcy court as the manager of MTLP's ongoing business concerns. All MTLP partners later ratified the actions of Rose as the managing partner, particularly the actions concerning the sale of the Travelodge. The MTLP limited partnership provided that the partnership was not dissolved upon the bankruptcy of a general partner. Therefore, Rose had authority to act for MTLP and sell the Travelodge. As a result, the title to the Travelodge was marketable.

¶ 41 As stated above, if Booth and Tevini had sustained actual loss or damages due to the unmarketability of the title, ATGF would have to indemnify them. However, the title was marketable. Because the title was marketable, the issue of damages need not be addressed. Furthermore, Booth and Tevini conceded at oral argument that because they never made any written application for financing and did not accept the discounted offer to buy, they did not suffer any actual damages. Therefore, there is no claim for damages under the ATGF policy.

## II. FRAUD

¶ 42 Booth and Tevini argue that the letter to Benge sent three months before the closing in regard to conversion of Rose's bankruptcy from a chapter 11 reorganization to a chapter 7 liquidation was not disclosed. They also argue that ATGF failed to disclose the title commitment. They contend that either disclosure would have prevented them from deciding to close on the purchase. Defendants counter that even though neither disclosure was an intentional attempt to conceal, and thus not a fraudulent concealment, plaintiffs' claim is barred by a three-year statute of limitations.

¶ 43 Section 78–12–26 provides:

An action may be brought within three years:

. . .

(3) for relief on the ground of fraud or mistake; except that the cause of action in such case does not accrue until the discovery by the aggrieved party of the facts constituting the fraud or mistake.

Utah Code Ann. § 78–12–26(3) (1996). Discovery by the aggrieved party of the facts constituting an alleged fraud is measured "from the time the fraud was actually known or could have been discovered through the exercise of reasonable diligence." *Baldwin v. Burton,* 850 P.2d 1188, 1196 (Utah 1993). Therefore, the "three-year statute of limitations for fraud 'begins to run from the time the person entitled to the property knows, or by reasonable diligence and inquiry should know, the relevant facts' of the fraud perpetrated against him." *Id.* (quoting *Auerbach v. Samuels,* 10 Utah 2d 152, 158, 349 P.2d 1112, 1116 (1960)). This means that if a party has the opportunity to know the facts constituting an alleged fraud, that party cannot remain inactive and then later allege a want of knowledge as a result of his own negligence. *See id.* (citing *Taylor v. Moore,* 87 Utah 493, 506–07, 51 P.2d 222, 229 (Utah 1935)).

¶ 44 In this case, Booth and Tevini claim that the October 1989 letter to Benge regarding conversion of Rose's chapter 11 bankruptcy to a chapter 7 proceeding was fraudulently concealed from them. However, in January 1990, within weeks of closing on the Travelodge, Booth and Tevini heard about the conversion and visited Rose's trustee administrator, Richardson. They discussed the impact of the bankruptcy on their purchase of the Travelodge. Shortly thereafter, Richardson called and assured Booth and Tevini that the trustee approved the sale.

¶ 45 In addition, Booth and Tevini claim schedule B of the title commitment was fraudulently concealed from them. However, Booth and Tevini admit to having seen and read the cover page of the title commitment on or before the date of the closing. That page states, "This Commitment must contain Schedules A and B and be duly validated by this signature." The accommodator that Tevini arranged to conduct the closing

claimed he warned Booth and Tevini not to close without seeing schedule B.

¶ 46 Booth was a creditor of MTLP and had been notified that MTLP was in bankruptcy. She had not been notified by the bankruptcy court that the MTLP bankruptcy had closed prior to the purchase of the Travelodge. Furthermore, Booth was not a novice at real estate transactions but had previously been involved as the sole purchaser of apartment buildings. Likewise, Tevini already had property he had purchased and was selling in this tax deferred exchange. These were not naive buyers. Reasonable diligence and inquiry would at least entail waiting· to see the entire title commitment before closing on a $1,725,000 purchase. By failing to do so, Booth and Tevini cannot now allege a want of knowledge.

¶ 47 Even when viewing the facts and inferences in the light most favorable to Booth and Tevini, it is clear that they knew, or by reasonable diligence and inquiry should have known in January or February 1990, of the facts concerning the alleged fraudulent concealment. They did not file their complaint until February 1995. Therefore, their claim is barred by section 78–12–26(3) of the Utah Code.

## CONCLUSION

¶ 48 We hold that the seventh district court did not err in granting summary judgment to ATGF, Benge, and Critchlow. In doing so, we affirm the court's finding that title to the Travelodge was marketable, Booth and Tevini sustained no injuries, and their claim of fraudulent concealment was barred by the statute of limitations.

¶ 49 Chief Justice HOWE, Justice DURHAM, Justice DURRANT, and Justice WILKINS concur in Associate Chief Justice RUSSON'S opinion.