2002 UT 42

**Stephen L. PETERSON, Plaintiff and Appellant,**

v.

**COCA–COLA USA, Coca–Cola USA Operations, Coca–Cola USA (BOD) Bottling Operations Department, Coca–Cola Fountain, Swire Pacific Holdings, Inc., a Delaware Corporation, dba, Coca–Cola Bottling Company of Salt Lake, aka, Swire Coca–Cola, Coca–Cola Bottling Company of Salt Lake, Defendants and Appellees.**

No. 20000804.

Supreme Court of Utah.

April 26, 2002.

Tim Dalton Dunn, Paul J. Simonson, David A. Goodwill, Salt Lake, for plaintiff.

Dale J. Lambert, Rebecca L. Hill, Salt Lake City, for defendants.

DURHAM, Chief Justice:

¶ 1 This is a personal injury action brought by Stephen Peterson against Swire Pacific Holdings Inc. (Swire), a Delaware corporation doing business as Coca–Cola Bottling Company of Salt Lake, for damages sustained in a motor vehicle accident in Salt Lake City. Peterson sued Swire as the employer of the driver, Thomas Stengel (Sten-

gel), based on the doctrine of respondeat superior. Peterson appeals the trial court's grant of partial summary judgment to Swire.

## FACTS

¶2 On February 12, 1992, Stengel was driving northbound on 900 East when he fell asleep at the wheel and his car collided with Peterson's. At the time of the accident Stengel was employed by Swire and acting within the scope of his employment.

¶3 On August 4, 1993, Peterson settled with Stengel for the amount of Stengel's automobile insurance policy limits. Stengel's insurance carrier, Nationwide Mutual Company (Nationwide), paid Peterson $50,000, and in return, Peterson and his wife signed a release. At the time of this settlement, neither Peterson nor his lawyer knew that Stengel was employed by Swire. The relevant part of the release states as follows:

> FOR AND IN CONSIDERATION OF the payment to me/us of the sum of *$50,000.00 FIFTY THOUSAND & NO/100* Dollars, and other good and valuable consideration, I/we, being of lawful age, have released and discharged, and by these presents do for myself/ourselves, my/our heirs, executors, administrators and assigns, release, acquit and forever discharge *Thomas & Susan Stengel and Nationwide Mutual Co. (reserving, however, our rights to be made whole through our uninsured motorist coverage under our auto insurer, American States Ins. Company )* and any and all other persons, firms and corporations, whether herein named or referred to or not, of and from any and all past, present and future actions, causes of action, claims, demands, damages, costs, loss of services, expenses, compensation, third party actions, suits at law or in equity, including claims or suits for contribution and/or indemnity, of whatever nature, and all consequential damage on account of, or in any way growing out of any and all known and unknown personal injuries, death and/or property damage resulting or to result from an accident that occurred on

or about the *12th* day of *Feb* 19 *92*, at or near *2800 S. & 9th E–SLC Utah.*

¶4 After settling with Stengel, Peterson obtained $300,000 for his injuries from Peterson's underinsured motorist carrier, American States Insurance (American). Peterson first learned of Stengel's employment with Swire during finalization of negotiations with American.

¶5 On February 9, 1996, this lawsuit was filed, and on December 8, 1997, Gayle Peterson was appointed Stephen Peterson's conservator and guardian because of his incapacity.

¶6 The trial court granted Swire's motion for summary judgment, concluding that: (1) the August 4, 1993 release entered into by Peterson was valid and relieved Swire of liability for all claims involving vicarious liability and respondeat superior; (2) there was no evidentiary or legal basis for reforming, voiding, or otherwise failing to enforce the release entered into by Peterson; and (3) if the release does not release Swire from vicarious liability, then Swire is entitled to a $350,000 credit for the money already received by Peterson from his own underinsured motorist carrier.[1] Peterson appealed.

## STANDARD OF REVIEW

¶7 Summary judgment is proper only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ P. 56(c). In considering a grant of summary judgment, "we review the court's legal decision for correctness, giving no deference, and review 'the facts and inferences to be drawn therefrom in the light most favorable to the nonmoving party.' " *Booth v. Attorneys' Title Guaranty Fund, Inc.,* 2001 UT 13, ¶28, 20 P.3d 319 (quoting *J.R. Simplot Co. v. Sales King Int'l Inc.,* 2000 UT 92, ¶13, 17 P.3d 1100).

## ANALYSIS

¶8 On appeal, Peterson argues that partial summary judgment should not have been

---

1. The district court also found that punitive damages were not permissible in this case. This ruling has not been challenged.

granted. He asserts that (1) the release was not valid to relieve Swire from vicarious liability; (2) the release should have been voided or reformed; and (3) Swire should not have been granted a $350,000 credit toward its liability.

## I. APPLICABILITY OF THE RELEASE TO SWIRE

 ¶ 9 Under Utah law, "Releases are contractual provisions and should be interpreted according to well-developed rules of contract interpretation." *Ward v. Intermountain Farmers' Ass'n*, 907 P.2d 264, 267 (Utah 1995) (citing *Simonson v. Travis*, 728 P.2d 999, 1001–02 (Utah 1986)); *Horgan v. Industrial Design Corp.*, 657 P.2d 751, 753 (Utah 1982). The underlying purpose in construing or interpreting contractual provisions is to determine the intentions of the parties. *See SME Industries, Inc. v. Thompson, Ventulett, Stainback and Associates, Inc.*, 2001 UT 54, ¶ 14, 28 P.3d 669 (citing *Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991)); *John Call Eng'g, Inc. v. Manti City Corp.*, 743 P.2d 1205, 1207 (Utah 1987). The court may consider extrinsic evidence of the parties' intentions where the contractual provision is ambiguous. *See SME Industries*, 2001 UT 54 at ¶ 14, 28 P.3d 669. "A contract provision is ambiguous if it is capable of more than one reasonable interpretation because of 'uncertain meanings of terms, missing terms, or other facial deficiencies.'" *Winegar*, 813 P.2d at 108 (quoting *Faulkner v. Farnsworth*, 665 P.2d 1292, 1293 (Utah 1983)).

 ¶ 10 In addition to the general rules of contract construction that apply to releases, there are statutory provisions that govern them. The two relevant statutes are section 78–27–42 of the Liability Reform Act (the LRA release clause) and section 15–4–4 of the Joint Obligations Act (the JOA release clause). The LRA release clause provides:

> A release given by a person seeking recovery to one or more defendants does not discharge any other defendant unless the release so provides.

Utah Code Ann. § 78–27–42 (1996).

The JOA release clause provides:

> [T]he obligee's release or discharge of one or more of several obligors, or of one or more of joint or of joint and several obligors, shall not discharge co-obligors against whom the obligee in writing and as part of the same transaction as the release or discharge expressly reserves his rights; and in the absence of such a reservation of rights shall discharge co-obligors only to the extent provided in Section 15–4–5.

Utah Code Ann. § 15–4–4 (1999).

Both acts similarly provide that "the release of one obligor does not discharge co-obligors against whom the obligee in writing expressly reserves his rights." *Nelson v. Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints*, 935 P.2d 512, 514 (Utah 1997). The application of the JOA language and the LRA language differs, however, where a release does not contain an express reservation of rights. The LRA release clause has been interpreted as requiring that a release "must contain language either naming the defendant or identifying the defendant with some degree of specificity in order to discharge that defendant from liability." *Child v. Newsom*, 892 P.2d 9, 12 (Utah 1995). The JOA release clause, however, has been interpreted as releasing a joint obligor from liability by the release of other joint obligors *unless* there is an express reservation in writing by the injured party. *See Krukiewicz v. Draper*, 725 P.2d 1349, 1350 (Utah 1986).

 ¶ 11 In determining the reach of these two statutes, this court has previously observed that the LRA is a pro tanto repeal of the JOA as it applies to regular co-defendants, but that the JOA still applies to vicariously liable parties. *See Nelson*, 935 P.2d at 514 n. 3. In the present case, Peterson is suing Stengel's employer, Swire, under a theory of vicarious liability, so the JOA applies to the interpretation of the release.

 ¶ 12 We find that the release is unambiguous because it is not "capable of more than one reasonable interpretation." *Winegar*, 813 P.2d at 108. The release specifically states that it releases Stengel, his wife, Nationwide, as well as "any and all other persons, firms and corporations, whether herein

named or referred to or not." The contract's only express reservation of rights is to allow Peterson to pursue additional recovery from his underinsured motorist carrier, American. Swire is a corporation that clearly falls within the definition of "any and all other persons, firms and corporations." Because the JOA release clause required Peterson to expressly reserve his rights against Swire in writing, which he did not do, *see Krukiewicz*, 725 P.2d at 1350, we find the release is valid as to Swire.

## II. ENFORCEABILITY OF THE RELEASE

¶ 13 Peterson argues that the release is void or should have been reformed because (1) Swire was an undisclosed principal at the time the release was signed and therefore should not be allowed to take advantage of the release; (2) Peterson was incompetent to sign the release; (3) mutual mistake of the parties requires the release's reformation; and (4) applying the JOA instead of the LRA to vicariously liable parties is unconstitutional.

### A. Undisclosed Principal

¶ 14 At the time Peterson signed the release agreement with Stengel, he did not know that Stengel was employed by Swire. Peterson argues that because Swire was Stengel's principal, Swire could not be released from vicarious liability for the accident without first disclosing its relationship to Stengel. Swire bases this argument on our decision in *Garland v. Fleischmann*, 831 P.2d 107, 110 (Utah 1992), where we observed:

> It is well established in the law that a principal is liable for the acts of his agent within the scope of the agent's authority, irrespective of whether the principal is disclosed or undisclosed. The fact that an agent acts in his own name without disclosing his principal does not preclude liability on the part of the principal when he is discovered to be such by a third party who has dealt with the agent. *3 Am.Jur.2d Agency* § 320 (1986). This is true even though the third person dealing with the agent did not learn of the existence of the

principal until after the bargain was completed. *Holman–O.D. Baker Co. v. Pre-Design, Inc.*, 104 N.H. 116, 118, 179 A.2d 454, 455 (1962).

¶ 15 Peterson's reliance on *Garland* is misplaced. *Garland* stands for the proposition that disclosure or nondisclosure of a principal will not absolve the principal of responsibility for an agent's actions. *See id.* However, the present case does not involve a question of agency or the existence of vicarious liability. Instead, it depends on the interpretation of a contractual release. For purposes of summary judgment, Swire conceded that Stengel was its agent acting in the course of his employment. Swire does not argue that it is free from liability for its agent's actions based on anything other than the release.

¶ 16 Peterson argues that his lack of knowledge of Stengel's agency justifies voiding or reforming the release. " 'If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.' " *Miller v. Celebration Mining Co.*, 2001 UT 64, ¶ 10, 29 P.3d 1231 (quoting *Restatement (Second) of Contracts* § 164(1) (1981)). Peterson, however, has presented no evidence that his lack of knowledge of Stengel's agency was caused by fraud or misrepresentation.

### B. Competence

¶ 17 Peterson argues that the release he signed with Stengel and Stengel's insurer should be voided because of Peterson was incompetent at the time of the contract. Competency to enter a contract is measured by whether " 'the mental facilities [were] so deficient or impaired that there was not sufficient power to comprehend the subject of the contract, its nature and its probable consequences, and to act with discretion in relation thereto, or with relation to the ordinary affairs of life.' " *Walker v. U.S. General Inc.*, 916 P.2d 903, 907 (Utah 1996) (citations omitted).

¶ 18 Peterson offered no evidence before the trial court indicating that he was unable to understand the nature of the release at

the time he signed it. He relied on his wife's appointment as his general guardian in 1997 to demonstrate incompetence. The release, however, was signed by Peterson on August 4, 1993, more than four years before the guardianship appointment. Although Mrs. Peterson's appointment as Peterson's general guardian is evidence of incompetence in 1997, it is not evidence that he was incompetent in 1993. Peterson's argument is particularly tenuous in light of the fact that neither Mrs. Peterson, Peterson's lawyer, Stengel, or Stengel's insurance carrier raised any concerns about Peterson's mental capacity at the time the release was signed.

### C. Mutual Mistake

¶ 19 Peterson next argues that the release should be voided due to mutual mistake. Mutual mistake warrants the reformation of written instruments if the complaining party can show:

> (1) that the instrument as made failed to conform to what both parties intended; or (2) that the claiming party was mistaken as to its actual content and the other party, knowing of this mistake, kept silent; or (3) that the claiming party was mistaken as to actual content because of fraudulent affirmative behavior.

*Mabey v. Kay Peterson Constr. Co.*, 682 P.2d 287, 290 (Utah 1984).

¶ 20 Peterson argues that neither of the parties intended to release Swire; so the release must fail. However, his characterization of the intent of Stengel and his insurance carrier is entirely speculative. Although upon summary judgment the court must view all facts and inferences in favor of the nonmoving party, it may not assume facts for which no evidence is offered. "Allegations or denials in the pleadings are not a sufficient basis for opposing summary judgment." *Hall v. Fitzgerald*, 671 P.2d 224, 227–28 (1983). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Thornock v. Cook*, 604 P.2d 934, 936 (Utah 1979). Peterson has offered nothing more than unsupported allegations to prove the intent, mistake, or fraud of the other parties to the release. Thus, the trial court properly found that Peterson's

claim of mutual mistake fails. *Cf. Hess v. Ford Motor Co.*, 27 Cal.4th 516, 526, 117 Cal.Rptr.2d 220, 41 P.3d 46 (2002) (holding that a release's broad language did not release a third party where the uncontroverted evidence established mutual mistake).

### D. Constitutionality of the operation of the JOA and the LRA

¶ 21 In general " '[A] constitutional question is not to be reached if the merits of the case in hand may be fairly determined on other than constitutional issues.' " *State v. Webster*, 2001 UT App 238, n. 8, 32 P.3d 976 (quoting *Hoyle v. Monson*, 606 P.2d 240, 242 (Utah 1980)). Because this case has not been resolved on other grounds, we address the constitutional question presented by Peterson.

¶ 22 As mentioned above, in *Nelson* we held that the release clause of the Joint Obligations Act applies to releases dealing with vicariously liable parties, while the release clause of the Liability Reform Act applies to all other co-defendants. *See Nelson*, 935 P.2d at 514 n. 3. Under the JOA, there must be an express reservation of rights by plaintiffs or the release operates to release all joint obligors. *See Krukiewicz*, 725 P.2d at 1350. Under the LRA, the release must name the defendant or identify the defendant with some degree of specificity for there to be a release. *See Child*, 892 P.2d at 12. Peterson argues that applying the JOA to vicariously liable parties and the LRA to regular co-defendants is a violation of Article I, Section 24, of the Utah Constitution's uniform operation of laws clause, because doing so affects similarly situated parties differently.

¶ 23 Article I, Section 24 provides that: "All laws of a general nature shall have uniform operation." Utah Const. art. I, § 24. Under the uniform operation of laws clause, we utilize a lower standard of review unless the statute infringes a "fundamental or critical right ... [or creates] classifications considered impermissible or suspect in the abstract." *Ryan v. Gold Cross Services, Inc.*, 903 P.2d 423, 426 (Utah 1995). Peterson has not argued that a constitutional right

has been implicated, nor do we find one. Therefore a low threshold applies in balancing "(1) whether the classification is reasonable, (2) whether the legislative objectives are legitimate, and (3) whether there is a reasonable relationship between the two." *See Ryan*, 903 P.2d at 426 (citing *Blue Cross & Blue Shield v. State*, 779 P.2d 634, 637 (Utah 1989)); *see also Malan v. Lewis*, 693 P.2d 661, 670–71 (Utah 1984). A statute has "a strong presumption of constitutionality, with doubts resolved in favor of its constitutionality." *See Warren v. Melville*, 937 P.2d 556, 558 (Utah Ct.App.1997) (citations omitted).

¶ 24 The first question is whether there is anything inherently unreasonable in the legislature's decision to treat vicariously liable defendants differently than other co-defendants. *See Ryan*, 903 P.2d at 427. We have often noted that vicarious liability does not arise because of actual negligence or fault. *See Nelson*, 935 P.2d at 513–14; *Krukiewicz*, 725 P.2d at 1350–51. Treating vicariously liable defendants as different in kind from defendants with some form of fault does not result in an inherently irrational classification, and is not based on any impermissible or suspect grouping. *See Ryan*, 903 P.2d at 427.

¶ 25 The second issue is whether the legislative purpose in separating vicariously liable defendants from regular co-defendants is legitimate. "[T]he court will sustain legislative action if it can reasonably conceive of facts which would justify the classifications made by the legislation." *Ryan*, 903 P.2d at 427 (citing *Blue Cross*, 779 P.2d at 641). In the present case, imputing a legitimate purpose to the legislature is not necessary because the legislature has itself referred to its purposes. One of the primary purposes of the legislature in enacting the LRA was

" 'basic fairness.' " *Sullivan v. Scoular Grain Co. of Utah*, 853 P.2d 877, 880 (Utah 1993) (quoting Tape of Utah Senate Floor Debates, 46th Leg.1986, Gen. Sess. (Feb. 12, 1986)). The legislature intended to promote fairness by abolishing joint and several liability for co-defendants liable on fault grounds because no party should be liable for "any amount in excess of the proportion of fault attributed to that defendant." Utah Code Ann. § 78–27–38 (1999). The same rationale does not logically extend to co-defendants to whom *no* fault can be apportioned, but who are instead subject to vicarious liability.

¶ 26 The LRA was intended "only to abolish the joint and several liability of 'defendants' ... but that does not affect an employer, who being only vicariously liable is not a 'defendant.' " [2] *Nelson*, 935 P.2d at 515 (Howe, J., concurring). As noted above, vicarious liability does not arise because of actual negligence or fault. *See Nelson*, 935 P.2d at 513–14; *Krukiewicz*, 725 P.2d at 1350–51. Therefore, it is legitimate for the legislature to draw a distinction between co-defendants who are at-fault and vicariously liable parties who are not. It is also legitimate for the legislature to promote fairness through abolition of joint and several liability for at fault co-defendants.

¶ 27 The last issue is whether there is a reasonable relationship between the statutory classification and the legislative purpose. We conclude that the classification is not an unreasonable means of achieving fairness in the apportionment of damages between different kinds of defendants.[3] Even though the legislative distinction between at-fault co-defendants and vicariously liable co-defendants requires two separate standards for the creation and interpretation of releases, it is not the court's place "to defend the merits,

---

**2.** Section 78–27–37 of the LRA states: "(1) 'Defendant' means a person, other than a person immune from suit ..., who is claimed to be liable because of fault to any person seeking recovery. (2) 'Fault' means any actionable breach of legal duty, act, or omission proximately causing or contributing to injury or damages sustained by a person seeking recovery, including negligence in all its degrees, contributory negligence, assumption of risk, strict liability, breach of express or implied warranty of a prod-

uct, products liability, and misuse, modification or abuse of a product."

**3.** Other state legislatures have made an explicit distinction between vicariously liable defendants and regular co-defendants when abrogating joint and several liability. *See* Ariz.Rev.Stat. Ann. § 12–2506(D)(2001); Idaho Code § 6–803(5) (2000); Wash. Rev.Code Ann. § 4.22.070(1)(a) (2002).

desirability, or rationality of legislative action." *Ryan*, 903 P.2d at 426. It is enough that distinguishing between at-fault co-defendants and vicariously liable ones is reasonable in light of the legislative objectives. *See id.*

¶ 28 Peterson extends his uniform operation of laws argument to plaintiffs who are disparately affected in their ability to collect damages by virtue of different standards governing releases under the JOA and the LRA. We disagree with the argument that the disparity is unconstitutional. In reality, both the JOA and the LRA provide a plaintiff with equal opportunity to pursue all liable parties. Neither the JOA nor the LRA will release either an at fault co-defendant or a vicariously liable one where the release expressly reserves the plaintiff's rights to pursue those parties. *See Nelson*, 935 P.2d at 514. Plaintiffs will only be treated differently where they do not carefully draft their releases or do not adequately investigate the possibility of other liable parties. The burden is on plaintiffs to understand the distinction between the JOA and the LRA. The JOA applies to vicariously liable co-defendants and the LRA applies to co-defendants who are at fault within the meaning of the act. *See Nelson*, 935 P.2d at 514 n. 3. The public policy arguments advanced by Peterson on behalf of plaintiffs should be addressed to the legislative process. So long as the distinctions made by the statute are reasonable, we may not invalidate them on constitutional grounds where no other factors such as fundamental rights are at issue.

### III. THE EXTENT OF SWIRE'S LIABILITY

¶ 29 In view of our holding regarding the applicability of the JOA to this release and its constitutionality, we affirm the trial court's dismissal of Swire by summary judgment. The issue of credit for underinsured motorist payments is thus moot.

### CONCLUSION

¶ 30 We affirm the district court's grant of summary judgment regarding the validity of the release signed by Peterson, as well as the lack of evidentiary or legal basis to void or

reform it. We vacate the district court's grant of summary judgment regarding the extent of Swire's liability as the issue is moot.

¶ 31 Associate Chief Justice DURRANT, Justice HOWE, Judge DAVIS, and Judge HOWARD concur in Chief Justice DURHAM'S opinion.

¶ 32 Having disqualified themselves, Justice RUSSON and Justice WILKINS do not participate herein; Court of Appeals Judge JAMES Z. DAVIS and District Judge FRED D. HOWARD sat.