2009 UT 28

Virginia HILL, Plaintiff, Appellant,
and Cross–Appellee,

v.

ESTATE OF Owen A. ALLRED; Corpora-
tion of the Presiding Elder of the Apos-
tolic United Brethren; J. LaMoine Jen-
son; Jenson Lumber Corporation, Inc.;
and Estate of John C. Putvin, Defen-
dants, Appellees, and Cross–Appellants,

Dennis E. Matthews; Jeffrey J. Norman;
James E. Sandmire; Diamond Auto Spe-
cialists, Inc.; Diamond Recreational
Rentals, Inc.; Pacific Rim Mortgage
and Loan Services, Inc.; Pacific Rim
Mortgage Brokers, Inc.; Diamond Auto
Body and Paint; Brisan Imports; and
Last Resort Enterprises, Inc., Defen-
dants and Appellee.

Nos. 20030980, 20060752.

Supreme Court of Utah.

May 1, 2009.

Rehearing Denied Sept. 21, 2009.

Clark R. Nielsen, Kathryn J. Steffey, Salt Lake City, Don S. Redd, Layton, for appellant.

Drew Briney, Spanish Fork, for appellees Estate of Owen A. Allred, Corp. of the Presiding Elder of the Apostolic United Brethren, J. LaMoine Jenson, and Jenson Lumber Corp.

Estate of John C. Putvin, Bingham Canyon, pro se appellee.

Dennis E. Matthews, Eagle Mountain, pro se appellee.

NEHRING, Justice:

¶ 1 Virginia Hill appeals the order of the district court awarding her damages on her claims of civil conspiracy, conversion, and fraudulent misrepresentation and denying her claims of money laundering and racketeering. Defendants cross-appeal, challenging the district court's award of damages. We affirm in part and reverse in part.

## FACTUAL BACKGROUND

¶ 2 The district court made extensive findings of fact below, on which we base the following recitation of the pertinent facts.

¶ 3 Virginia Hill moved to southern Utah from Michigan, seeking a fresh start in life following marital difficulties. While visiting St. George, Ms. Hill became acquainted with John Shugart, the leader of a small religious group, and asked Mr. Shugart for help purchasing real property known as the Desert Inn Ranch. The owner of the ranch had set a purchase price of $1.5 million, which Ms. Hill could have paid in cash. A friend of Mr. Shugart, Dennis Matthews, agreed to help Ms. Hill negotiate with the owner to purchase the ranch. The owner of the ranch told Mr. Matthews that he did not want to receive payments in cash and did not want to receive payment as a lump sum. To further facilitate the purchase of the ranch, Mr. Matthews suggested that Ms. Hill hire John Putvin, a former real estate agent, which she did.

¶ 4 Mr. Shugart then delivered $1 million in cash, belonging to Ms. Hill, to Mr. Putvin and Mr. Matthews and directed them to proceed with the purchase of the ranch. Mr. Shugart, Mr. Matthews, and Mr. Putvin decided to invest some of Ms. Hill's money to generate cash flow to make payments on the ranch and to increase the amount of the principal. Ms. Hill agreed, in general, to the plan of investing her money.

¶ 5 Once Mr. Matthews and Mr. Putvin received Ms. Hill's money, they became concerned about how the purchase of the ranch would affect their relationship with the Corporation of the Presiding Elder of the Apostolic United Brethren, a religious group with which they were affiliated. Mr. Shugart had previously attempted to purchase the ranch with the help of the AUB, but the ranch had been foreclosed upon. The AUB lost a significant amount of money as a result, and it blamed Mr. Shugart for its loss. Additionally, the leader of the AUB, Owen Allred, considered Mr. Shugart to be a threat to his ecclesiastical leadership. Mr. Matthews feared that they would be compromising their loyalty to Mr. Allred, who he believed to hold authority of divine origin, by helping Mr. Shugart purchase the ranch, so they decided that they should discuss the matter of Ms. Hill and the ranch with Mr. Allred.

¶ 6 When Mr. Matthews and Mr. Putvin met with Mr. Allred, they represented that the money came from Ms. Hill with "no strings attached." Ms. Hill was described as a woman who wanted "to atone for … past sins." The men revealed, however, that Mr. Shugart was involved in the ranch acquisition discussions and that Mr. Shugart wished to grant Mr. Matthews operational control over the ranch under the title of "bishop." Mr. Allred told Mr. Matthews and Mr. Putvin to proceed with the purchase of the ranch, and Mr. Matthews agreed to side with Mr. Allred in the event that Mr. Allred's instructions regarding the ranch conflicted with those of Mr. Shugart. Later, Mr. Matthews met with Mr. Allred, unaccompanied by Mr. Putvin. At this meeting, Mr. Allred ordained Mr. Matthews as the bishop of the ranch in order to preempt any attempt by Mr. Shugart to do so.

¶ 7 In addition to the $1 million already given to Mr. Matthews and Mr. Putvin, Ms. Hill provided them, through Mr. Shugart, with another $500,000 for the purchase of the ranch and paid Mr. Putvin $40,000 for his services.

¶ 8 Mr. Matthews and Mr. Putvin received $1.54 million of Ms. Hill's money in total but never delivered the promised ranch or repaid any of the money. They had other individuals use the cash (in amounts less than $10,000 to avoid IRS reporting requirements) to open bank accounts and then write checks back to Mr. Putvin. They gave a bag of cash

to J. LaMoine Jenson, the owner of Jenson Lumber Corporation, Inc.,[1] who deposited portions of the money along with his regular deposits and eventually returned a check for $30,000 to Mr. Putvin. Mr. Putvin paid some of the money to the AUB, which he characterized as tithing. A check was later delivered back to Mr. Putvin by Mr. Allred. Mr. Matthews used some of the money to conduct home improvements and to pay federal tax liens.

¶ 9 Mr. Putvin also used Ms. Hill's money to establish various businesses with James Sandmire. These businesses then purchased inventory and facilities using the money. Diamond Auto Specialties, Inc., one of the businesses Mr. Putvin and Mr. Sandmire founded with Ms. Hill's money, used Ms. Hill's money to purchase real property. Mr. Putvin loaned Ms. Hill's money to Diamond Auto and structured the repayment of the money so that repayment would be made to the AUB. Mr. Putvin assigned his rights under the trust deed for the real property to the AUB, and payments were made to them.

¶ 10 Mr. Putvin did make some effort to purchase the ranch after he and Mr. Matthews assumed control of Ms. Hill's money. An option agreement was drafted, but never executed, and Mr. Putvin never made the required $500,000 down payment on the ranch.

¶ 11 Ms. Hill soon became concerned about the status of her money. She and Mr. Shugart met with both Mr. Matthews and Mr. Allred. Mr. Matthews told her that Mr. Putvin had all her money and was nowhere to be found. Mr. Allred denied knowing anything about her money. Ms. Hill eventually hired private investigators, who attempted to locate Mr. Putvin. They were unsuccessful. All the people they interviewed, including Mr. Matthews and Mr. Sandmire, told them they were unaware of Mr. Putvin's whereabouts. During this time, Mr. Shugart informed Ms. Hill that he had received divine revelations that it was God's will that she not pursue litigation to recover her money. Finally, one of Ms. Hill's investigators received a tape of the initial meeting between Mr. Putvin, Mr. Matthews, and Mr. Allred. She was thereafter able to learn what had happened to her money. Upon learning that none of her money remained in Mr. Putvin's possession and could not be returned to her, she filed suit.

## PROCEDURAL BACKGROUND

¶ 12 Suit was filed in August 1997 against Mr. Allred,[2] Mr. Matthews, Mr. Putvin,[3] the AUB, Mr. Jenson, Jenson Lumber Corp., Mr. Sandmire, and several other defendants, alleging claims of civil conspiracy, constructive fraud, conversion, unjust enrichment, money laundering, fraudulent misrepresentation, racketeering, and intentional infliction of emotional distress.[4]

¶ 13 Defendants denied all the allegations, asserting that the statute of limitations had run on all of Ms. Hill's claims. Ms. Hill argued that her claims were timely because she was unaware of them until November 1994 due to the misrepresentations made by Defendants. Further, Ms. Hill showed that Mr. Putvin was out of the state for substantial periods of time between 1990 and 1996. The Fourth District Court held that Ms. Hill's claims were not timely filed and dismissed them, with the exception of those against Mr. Putvin. Ms. Hill appealed, and

1. In the briefs and in the record, J. LaMoine Jenson is variously referred to as J. Lamoine Jensen, J. LaMoine Jensen, and J. LaMoine Jenson; Jenson Lumber Corp. is also referred to as Jenson Lumber Corp., Jensen Lumber Co., and Jenson Lumber Co. Counsel for Mr. Jenson, in the appellate briefs, uses J. LaMoine Jenson and Jenson Lumber Corp., and we do the same.

2. Sometime during the litigation/appeal, Mr. Allred died and his estate was substituted in his place. Throughout this opinion, however, we will refer to the substituted estate as Mr. Allred.

3. Sometime during the litigation/appeal, Mr. Putvin died and his estate was substituted in his place. Throughout this opinion, however, we will refer to the substituted estate as Mr. Putvin.

4. Because of the number of parties named as defendants and because some of the defendant parties are appellees on some issues and also cross-appellants on other issues, we will refer to them collectively throughout this opinion as Defendants.

we reversed and remanded. *Hill v. Allred,* 2001 UT 16, ¶ 1, 28 P.3d 1271.

¶ 14 Following a bench trial, the district court found that Mr. Allred, Mr. Matthews, Mr. Putvin, the AUB, Mr. Jenson, Jenson Lumber Corp., and Mr. Sandmire all engaged in a civil conspiracy to deprive Ms. Hill of $1.54 million. Further, the district court held that Defendants converted Ms. Hill's money and that they made fraudulent misrepresentations to her. The court also found that although there were instances where Defendants engaged in money laundering, Ms. Hill could not bring a cause of action for money laundering as a private citizen. Finally, the district court held that Ms. Hill did not meet her burden of proof on her claims of racketeering and intentional infliction of emotional distress.

¶ 15 The district court awarded Ms. Hill $1.54 million in actual damages plus prejudgment interest and costs. The court declined Ms. Hill's request for punitive damages, holding that punitive damages were not available because Ms. Hill came to the court with unclean hands. The district court held the parties jointly liable for the damages awarded; however, it apportioned that amount as follows: Mr. Matthews and Mr. Putvin were held personally liable for the entire amount of damages, to be reduced by the amounts other defendants were held liable for; Mr. Allred was held liable for only $30,000; Mr. Jenson and Jenson Lumber Corp. for $30,000, collectively; the AUB for $250,000; and Mr. Sandmire for $500,000.

¶ 16 The parties filed an array of post-trial motions. Ms. Hill filed a motion to reconsider and modify the decision regarding punitive damages, a motion to amend the judgment regarding the holding that she did not meet her burden of proving racketeering activity, and a motion to amend the pleadings to include a claim of receiving stolen property and for treble damages. Defendants filed an objection to the award of prejudgment interest, a motion to vacate the judgment based on errors in the findings of fact, and a motion to amend the judgment to deny the entire award of damages based on unclean hands. The district court denied all of the parties'

post-trial motions. Ms. Hill appealed and Defendants cross-appealed.

¶ 17 Ms. Hill makes the following five arguments on appeal: (1) The district court erred as a matter of law in denying her punitive damages because she had unclean hands; (2) The district court erred in refusing to hold all of the defendants jointly and severally liable for civil conspiracy; (3) The district court erred in holding that she did not meet her burden of proving a pattern of unlawful activity under her racketeering claim; (4) The district court erred in denying her motion to amend the pleadings to include a claim for receiving stolen property and for treble damages; and (5) The district court erred in finding that the assignment of a trust deed to Mr. Jenson and the assignment of a trust deed to the AUB were actually only the assignment of one trust deed.

¶ 18 In their cross-appeal, Defendants make the following seven arguments: (1) The district court erred by awarding Ms. Hill damages after finding that she had unclean hands; (2) The district court erred by failing to award the AUB attorney fees for prevailing on the racketeering claim; (3) The district court erred in refusing to apportion liability to Mr. Shugart; (4) The district court erred because it did not make findings of fact and conclusion of law for each of Defendants' affirmative defenses; (5) The district court's award of damages constituted punitive damages and should not have been allowed because Ms. Hill had unclean hands; (6) The district court erred in awarding prejudgment interest; and (7) The district court erred in awarding damages against the AUB in the amount of $30,000. We will first address Ms. Hill's arguments in the order listed above. Our holdings on several of these claims resolve cross-appeal arguments brought by Defendants. We will then address the Defendants' remaining arguments.

## ANALYSIS

### I. THE DOCTRINE OF UNCLEAN HANDS DOES NOT PREVENT AN AWARD OF PUNITIVE DAMAGES IN THIS CASE

¶ 19 The district court awarded Ms. Hill $1.54 million in actual damages, which com-

pensated her for the total amount she claimed was taken from her. Despite this victory, the district court denied her request for attorney fees and punitive damages because it found that she had "unclean hands." It based its finding that Ms. Hill had unclean hands on her failure to produce tax returns showing she had paid income taxes on the money that Defendants converted. Ms. Hill argues that the district court erred as a matter of law when it placed the burden of proving clean hands on her. She argues that since unclean hands was an affirmative defense raised by Defendants, they had the burden of proving it. She also argues that they did not meet that burden and therefore punitive damages should have been awarded. We find that the district court erred when it placed the burden of proving clean hands on Ms. Hill.

¶ 20 We review for correctness whether the doctrine of unclean hands applies to Ms. Hill's claim for punitive damages. *RHN Corp. v. Veibell*, 2004 UT 60, ¶ 35, 96 P.3d 935. We hold that it does not and therefore reverse the district court's ruling.

¶ 21 The district court determined that "[Ms.] Hill has not come before the court with clean hands." The court justified this ruling with the statement: "The clean hands doctrine finds expression in the maxim that 'he who seeks equity must do equity.'" (quoting *Rosenthyne v. Matthews–McCulloch Co.*, 51 Utah 38, 168 P. 957, 960 (1917)).

¶ 22 Utah courts have long recognized that "he who seeks equity must do equity." *Horton v. Horton*, 695 P.2d 102, 107 (Utah 1984). We do not question the legitimacy of these statements. Our concern lies instead with the application of the doctrine to Ms. Hill's claims. The district court ruled on six of Ms. Hill's causes of action. Tellingly, none of the six rulings were made on equitable grounds. Ms. Hill only sought equitable relief as an alternative to her fraudulent conversion claim, and the district court did not address her alternative claim because it found that Defendants converted Ms. Hill's money. Therefore, the hygiene of her hands was never at issue. Because the court never invoked equitable powers to award Ms. Hill damages, it was not justified when it turned

to an equitable principle to defeat her claims for punitive damages and attorney fees. As we recently noted, "The right to an equitable remedy is an exceptional one, and absent statutory mandate, equitable relief should be granted only when a court determines that damages are inadequate and that equitable relief will result in more perfect and complete justice." *Ockey v. Lehmer*, 2008 UT 37, ¶ 44, 189 P.3d 51 (alteration omitted) (internal quotation marks omitted). Based on the foregoing, we need not reach the question of whether the district court properly assigned to Ms. Hill the burden of proving clean hands. We find that because Ms. Hill was not awarded damages on equitable grounds, the district court erred in denying Ms. Hill punitive damages based on unclean hands.

## II. THE DISTRICT COURT DID NOT COMMIT PLAIN ERROR IN REFUSING TO HOLD DEFENDANTS JOINTLY AND SEVERALLY LIABLE

¶ 23 Ms. Hill urges us to reverse the district court's ruling apportioning liability between Defendants. She argues that *Jedrziewski v. Smith* requires liability in civil conspiracy cases to be joint and several and does not allow the apportioning of liability in such cases. 2005 UT 85, 128 P.3d 1146. This is a correct reading of *Jedrziewski*; however, Ms. Hill failed to preserve this argument below. Ms. Hill admits that the issue of joint and several liability was not preserved below, but she argues that *Jedrziewski's* clarification of the Liability Reform Act's applicability presented an exceptional circumstance that allows us to review the issue despite the lack of preservation. Alternatively, Ms. Hill argues that even though the apportionment issue was not preserved, we should reverse the holding of the district court because it was plain error.

¶ 24 Where an argument is not preserved below, we will only review the issue if exceptional circumstances exist or if the lower court committed plain error. *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346. We will examine Ms. Hill's exceptional circum-

stances argument first, followed by her plain error argument.

 ¶ 25 Exceptional circumstances is an exception to the preservation requirement that is used infrequently and usually requires "rare procedural anomalies." *State v. Dunn*, 850 P.2d 1201, 1209 n. 3 (Utah 1993). Ms. Hill bases her exceptional circumstances argument on the court of appeals' characterization of our holding in *State v. Lopez*, 873 P.2d 1127 (Utah 1994). In *State v. Irwin*, the court of appeals stated that in *Lopez*, we "employed the 'exceptional circumstances' rubric where a change in law or the settled interpretation of law colored the failure to have raised an issue at trial." 924 P.2d 5, 10 (Utah Ct.App.1996). In *Lopez*, we found that exceptional circumstances existed that allowed us to address an argument raised by the defendant for the first time on appeal; however, the procedural posture of *Lopez* was more unusual than a failure to object to an action by the district court. *Lopez*, 873 P.2d at 1134 n. 2. The defendant in *Lopez* successfully moved to suppress evidence obtained following a traffic stop. He based his motion to suppress on an argument that the stop was an unconstitutional pretext stop under the Fourth Amendment of the United States Constitution. The state petitioned for interlocutory review, and the court of appeals maintained the pretext stop doctrine. The defendant and the state both filed petitions for writ of certiorari, the state arguing that the pretext stop doctrine should be rejected and the defendant arguing that it should be adopted under the Utah State Constitution.

¶ 26 The defendant had not previously raised the argument that the pretext stop doctrine should be adopted under the Utah Constitution, and the state argued that the defendant waived the argument by failing to raise it below. We allowed the defendant to raise the argument for the first time on appeal because of exceptional circumstances, noting that

> [a]t the time of the suppression hearing, the pretext doctrine was the controlling rule of Fourth Amendment law as interpreted by the court of appeals. Defendant had no reason to argue that the doctrine be adopted under article I, section 14 until the State challenged the doctrine on appeal. Likewise, arguments under article I, section 24 did not appear applicable until the court of appeals ruled that "equal protection policies constrain us to uphold the pretext doctrine."

*Id.* (quoting *State v. Lopez*, 831 P.2d 1040, 1046 (Utah Ct.App.1992)).

¶ 27 The circumstances in this case are not exceptional in the way that the circumstances in *Lopez* were. In *Lopez*, the settled interpretation of the law favored the defendant. There was no need for him to argue for a different interpretation of the law below because the existing interpretation produced the outcome he desired. The defendant had no reason to raise a state constitutional argument until it became apparent that the settled law on which he had relied was under attack. In contrast, in Ms. Hill's case, the interpretation of the law that the district court used did not favor Ms. Hill. She had every reason to argue for a different allocation of damages but did not.

¶ 28 Furthermore, although there was case law stating that joint and several liability was abolished for codefendants on fault grounds, *Peterson v. Coca-Cola USA*, 2002 UT 42, ¶ 25, 48 P.3d 941, prior to *Jedrziewski*, there was no case law that specifically stated that civil conspiracy claims were governed by the LRA. In fact, joint and several liability for civil conspiracy was what the defendants in *Jedrziewski* were trying to avoid when they advanced their argument that "the LRA preempted the common law doctrine of civil conspiracy." *Jedrziewski*, 2005 UT 85, ¶ 10, 128 P.3d 1146. Since there was no clear statement regarding the LRA's application to civil conspiracy claims at the time judgment was entered in Ms. Hill's case, she could have advanced the same argument that ultimately carried the day in *Jedrziewski*, that the LRA has no effect on a civil conspiracy cause of action. That she failed to recognize that such an argument existed does not present an exceptional circumstance.

¶ 29 Finally, Ms. Hill's argument that an exceptional circumstance exists because *Jedrziewski* changed a settled interpretation of law fails because that argument is premised on an assumption that the district court re-

lied on the LRA in refusing to impose joint and several liability. No such reliance is apparent in the district court's order. In the section of the order titled Measure of Damages, the district court finds Defendants jointly liable for $1.54 million plus prejudgment interest and costs, but it makes no mention of the LRA. As there was no mention of the LRA, Ms. Hill had no reason to believe that the award of damages was constrained by the LRA and could have argued for joint and several liability under the common law civil conspiracy cause of action.

■ ¶ 30 As Ms. Hill's failure to raise the issue of joint and several liability is not excused by an exceptional circumstance, we will examine whether it was plain error for the district court to apportion liability.

> [T]o establish the existence of plain error and to obtain appellate relief from an alleged error that was not properly objected to, the appellant must show the following: (i)[a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined.

*Dunn,* 850 P.2d at 1208–09. Our holding in *Jedrziewski* makes clear that an error occurred in Ms. Hill's case and that liability for civil conspiracy should have been joint and several. Also, although it may be possible to recover from Mr. Putvin and Mr. Matthews personally and through their businesses, it would be more favorable to Ms. Hill to be able to recover from all of the defendants who participated in the civil conspiracy against her. Therefore, the key question in this case is whether the error should have been obvious to the district court.

¶ 31 As Ms. Hill points out, prior opinions have included general statements that the LRA abolished joint and several liability. *See Peterson,* 2002 UT 42, ¶ 25, 48 P.3d 941; *Sanns v. Butterfield Ford,* 2004 UT App 203, ¶ 13, 94 P.3d 301; *Nat'l Serv. Indus., Inc. v. B.W. Norton Mfg. Co., Inc.,* 937 P.2d 551, 554–55 (Utah Ct.App.1997). The case of *Field v. Boyer Co.,* 952 P.2d 1078 (Utah 1998), somewhat confused the issue of the

application of the LRA, as demonstrated by both parties in *Jedrziewski* claiming that *Field* supported their positions on whether the LRA applied to civil conspiracy. *Jedrziewski,* 2005 UT 85, ¶¶ 17–24, 128 P.3d 1146 (describing the "riddle of *Field v. Boyer*" presented by the plurality opinion in that case and determining that the question of whether the LRA applies to intentional torts had not yet been decided). Although in *Jedrziewski* we held that the LRA did not apply to civil conspiracy, given the confusion caused by *Field,* that conclusion was not so apparent that it should have been obvious to the district court. Even though the district court did not expressly state that it was relying on the LRA in apportioning liability, the state of the law regarding the LRA's application did not make it obvious that the LRA did not apply to civil conspiracy; therefore, the district court did not commit plain error.

¶ 32 Because we find that there were no exceptional circumstances and that the district court did not commit plain error in apportioning liability, we affirm the district court's apportionment of liability.

## III. THE DISTRICT COURT ERRED IN HOLDING THAT THE AUB'S ACTIVITIES DID NOT CONSTITUTE A PATTERN OF UNLAWFUL ACTIVITY

■ ¶ 33 The Pattern of Unlawful Activity Act, which we will refer to as the Act, allows a person injured by a pattern of unlawful activity to bring a civil suit against the parties engaged in the prohibited conduct even if no criminal action is pursued. Utah Code Ann. § 76–10–1605(1) (2003). In such a civil suit, the Act provides for an award of double damages, costs, and attorney fees to the individual who was injured by the pattern of unlawful activity. *Id.* § 76–10–1605(1)–(2).

¶ 34 Under the Act,

> "Pattern of unlawful activity" means engaging in conduct which constitutes the commission of at least three episodes of unlawful activity, which episodes are not isolated, but have the same or similar purposes, results, participants, victims, or

methods of commission, or otherwise are interrelated by distinguishing characteristics. Taken together, the episodes shall demonstrate continuing unlawful conduct and be related either to each other or to the enterprise.

*Id.* § 76–10–1602(2).

¶ 35 Ms. Hill argues that each unlawful act by Defendants in furtherance of the conversion of her money constitutes an episode of unlawful activity and therefore a pattern exists. Defendants argue that the conversion of Ms. Hill's money, though not accomplished in one single act, was only one episode of criminal activity and, therefore, does not constitute a pattern of unlawful activity. The district court agreed with Defendants and held that their actions did not constitute a pattern of unlawful activity because there was only one episode of criminal activity, the conversion of Ms. Hill's money.

¶ 36 "[M]atters of statutory construction are questions of law that are reviewed for correctness." *Esquivel v. Labor Comm'n,* 2000 UT 66, ¶ 13, 7 P.3d 777 (internal quotation marks omitted). We therefore give no deference to the district court's interpretation of pattern under the Act.

¶ 37 The district court relied exclusively on a federal district court case, *Cook v. Zions First Nat'l Bank,* 645 F.Supp. 423 (D.Utah 1986), to determine what was required to form a pattern of unlawful activity. In *Cook,* the federal district court relied on the United States Supreme Court's interpretation of the term pattern as used in the Racketeer Influenced and Corrupt Organizations Act to interpret the term pattern in the Utah Act. *Id.* at 425–27. Though we have looked in the past to federal interpretations of RICO provisions when interpreting the Act, the Supreme Court precedent relied upon by the *Cook* court is no longer a correct statement of the test for determining whether a pattern of racketeering exists.

¶ 38 Although we are not obligated to give pattern of unlawful activity the same interpretation as pattern of racketeering activity under RICO, the extent to which section 76–10–1602(2) borrows from RICO and cases interpreting the RICO provision suggests that in this case the terms should be interpreted to mean the same thing. The first sentence under the Act's definition of a "pattern of unlawful activity" includes "engaging in conduct which constitutes the commission of at least three episodes of unlawful activity, which episodes are not isolated, but have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics." Utah Code Ann. § 76–10–1602(2). The United States Supreme Court in *Sedima, S.P.R.L. v. Imrex Co.* recognized that similar language informs the meaning of "pattern of racketeering activity" under the federal RICO scheme. 473 U.S. 479, 497 n. 14, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (recognizing that "conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events"). In *Sedima,* the Court also quoted congressional history that stated that a pattern required " 'continuity plus relationship.' " *Id.* (emphasis omitted) (quoting S.Rep. No. 91–617, p. 158 (1969)). The continuity plus relationship element was also adopted as part of the definition of pattern under the Act. The second sentence of Utah Code section 76–10–1602(2) states, "Taken together, the episodes shall demonstrate continuing unlawful conduct and be related either to each other or to the enterprise." It was added to the statutory definition shortly after the *Sedima* case. *Cf.* Utah Code Ann. § 76–10–1602(4) (Supp. 1983); Utah Code Ann. § 76–10–1602 (1987). As the Legislature has specifically included the concept of continuity plus relationship in the Act's definition of pattern of unlawful activity in response to the congressional history pointed out in *Sedima,* it makes sense to use the Supreme Court's clarification of that phrase as the test for whether there is a pattern of unlawful activity.

¶ 39 In *H.J. Inc. v. Northwestern Bell Telephone Co.,* the Supreme Court clarified what was required for continuity plus relationship and therefore what constituted a pattern of racketeering activity under RICO. 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Prior to *H.J.,* the federal circuit

courts used different tests to determine if a pattern of racketeering activity existed. In particular, the Eighth Circuit ruled that "a single fraudulent effort or scheme is insufficient to establish a pattern of racketeering activity," and multiple schemes must be present. *H.J.*, 492 U.S. at 234–35, 109 S.Ct. 2893 (alteration omitted) (internal quotation marks omitted). It held that multiple bribes paid by Northwestern Bell Telephone Company to the agency in charge of rate setting, which resulted in the agency setting an unreasonably high rate, were only in furtherance of one scheme and therefore did not constitute a pattern of racketeering activity. The Supreme Court reversed. It reasoned that proof of multiple schemes was unnecessary and that "to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Id.* at 239, 109 S.Ct. 2893 (emphasis omitted). The Court further stated that "[c]ontinuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. 2893 (internal quotation marks omitted). Continuity may be demonstrated "over a closed period by proving a series of related predicates extending over a substantial period of time," and if a RICO action is "brought before continuity can be established in this way," continuity can be shown if "the threat of continuity is demonstrated." *Id.* at 242, 109 S.Ct. 2893 (emphasis omitted).

¶ 40 Use of the *H.J.* test is proper because we previously upheld a criminal conviction "where the defendant engaged in a pattern of unlawful activity by participating in seventy-four wholesale illicit drug transactions with one other person." *Alta Indus., Ltd. v. Hurst*, 846 P.2d 1282, 1289 n. 14 (Utah 1993); *see also State v. McGrath*, 749 P.2d 631, 635–36 (Utah 1988). Under the multiple scheme test, this could have been viewed as one scheme to wholesale drugs. It was not, however, and each sale was viewed as one episode despite the fact that all the sales contributed to the same objective of selling drugs. *McGrath*, 749 P.2d at 635–36.

¶ 41 The proper test for determining whether there was a pattern of unlawful activity is whether there was "a series of related predicates extending over a substantial period of time" or a demonstrated threat of continuing unlawful activity and not whether there were multiple schemes. *H.J.*, 492 U.S. at 242, 109 S.Ct. 2893. In this case, the district court acknowledged that there were several incidents of unlawful activity. It found that "[t]he defendants made fraudulent misrepresentations, converted Hill's money, received stolen property, and conspired to prevent Hill's recovery." These acts had a similar purpose in that they were committed by Defendants in order to keep Ms. Hill's money for their own uses. Similar parties participated in each act and all of the acts had the same victim, Ms. Hill. The acts were related to one another in that the misrepresentation, conspiracy, and money laundering were attempts to conceal the theft of Ms. Hill's money. The unlawful acts occurred over a five-year period, thus demonstrating continuing unlawful activity. Under the proper test for pattern of unlawful activity, we find that Defendants' conduct constituted a pattern of unlawful activity. Therefore, we reverse the holding of the district court.

¶ 42 In their cross-appeal, Defendants seek attorney fees as the prevailing party on the Pattern of Unlawful Activity claim. Since there was in fact a pattern of unlawful activity, Defendants are not entitled to attorney fees on this issue.

## IV. THE DISTRICT COURT DID NOT ERR IN DENYING MS. HILL'S RULE 15(b) MOTION

¶ 43 Ms. Hill argues that the district court erred in denying her rule 15(b) motion to amend the pleadings. Ms. Hill moved to amend the pleadings under Utah Rule of Civil Procedure 15(b) to pray for treble damages and attorney fees under Utah Code section 76-6-412, arguing that the parties impliedly tried the issue of receiving stolen property because its elements are essentially the same as the elements of conversion. The district court denied Ms. Hill's motion.

First, the district court held that conversion and receiving stolen property had different elements, notably, receiving stolen property requires knowledge that the property is stolen whereas conversion does not require conscious wrongdoing. The district court held that the parties did not impliedly try the issue of receiving stolen goods because the question of whether Defendants knew the money was stolen was never answered. Second, the district court held that even if the elements were the same, Defendants did not impliedly consent to try the issue because there was no mention of receiving stolen property or the damages associated with it. Finally, the district court held that the pleadings should not be amended because Defendants would be prejudiced by a remedy that would result in significant monetary damages.

¶ 44 We review the district court's application of rule 15(b) for correctness. *Keller v. Southwood N. Med. Pavilion, Inc.*, 959 P.2d 102, 105 (Utah 1998). "However, because the trial court's determination of whether the issues were tried with all parties' implied consent is highly fact intensive, we grant the trial court a fairly broad measure of discretion in making that determination under a given set of facts." *Id.* (internal quotation marks omitted).

¶ 45 On appeal, Ms. Hill argues she should have been allowed to amend the pleadings because the district court found that Defendants received stolen goods. She also points out that she presented evidence at trial that demonstrated Defendants were informed that the money was stolen. As to the district court's second reason for denying her motion, Ms. Hill asserts that Defendants impliedly consented to try the issue of receiving stolen property because they presented evidence that they were unaware Ms. Hill's money was stolen and were unaware of Mr. Putvin's scheme. Finally, Ms. Hill urges that the district court's consideration of prejudice was improper because Defendants did not object to the introduction of evidence regarding receiving stolen property. In response, Defendants assert that while Ms. Hill points out evidence supporting elements of statutory theft that was introduced without objection, she fails to provide evidence that the parties understood the evidence was aimed at the issue of receiving stolen property.

¶ 46 Utah Rule of Civil Procedure 15(b) reads as follows:

When issues not raised by the pleading are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendments of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits.

¶ 47 Rule 15(b) has two parts, one mandatory and one discretionary. *Gen. Ins. Co. of Am. v. Carnicero Dynasty Corp.*, 545 P.2d 502, 505–06 (Utah 1976). Where the court finds that the issue was tried by implied consent, it must "treat the issues in all respects as if they had been raised in the pleadings." *Keller*, 959 P.2d at 105. When an objection is made to evidence on the ground that it is outside the scope of the pleadings, then the court may take into account whether amendment will serve the merits of the action and whether amendment will prejudice the nonmoving party. *Gen. Ins. Co.*, 545 P.2d at 506.

¶ 48 Implied consent to try an issue "may be found where one party raises an issue material to the other party's case or where evidence is introduced without objection, where it appear[s] that the parties understood the evidence [is] to be aimed at the unpleaded issue." *Colman v. Colman*, 743 P.2d 782, 785 (Utah Ct.App.1987) (first alteration in original) (citation and internal quotation marks omitted). Further, the "test for

determining whether pleadings should be deemed amended under Utah R. Civ. P. 15(b) is whether the opposing party had a fair opportunity to defend and whether it could offer additional evidence if the case were [retried] on a different theory." *Id.* at 785 (internal quotation marks omitted). "[W]hen evidence is introduced that is relevant to a pleaded issue and the party against whom the amendment is urged has no reason to believe a new issue is being injected into the case, that party cannot be said to have impliedly consented to trial of that issue." *Keller,* 959 P.2d at 105 (internal quotation marks omitted).

¶ 49 Although the district court found in its Amended Findings of Fact and Conclusions of Law that "[t]he active concealment by the defendants as to any involvement or knowledge concerning Hill's money [is] simply inconsistent with the defendants' statements ... that Putvin's true purposes were always unknown to the rest of the defendants," there was no finding that Defendants in fact knew the money was stolen. Thus, there was no finding as to whether the knowledge necessary to a claim of receiving stolen property was present. Additionally, the evidence was relevant to the conversion issue, and since there was no mention of receiving stolen property, Defendants would have had no reason to believe that a new issue was being introduced into the case.

¶ 50 We find that the record supports the district court's holding that the issue of receiving stolen property was not tried by implied consent. We therefore affirm the district court's denial of Ms. Hill's rule 15(b) motion.

## V. THE DISTRICT COURT ERRED IN HOLDING THAT THERE WAS ONLY ONE TRUST DEED

¶ 51 Ms. Hill argues that the district court erred in finding that there was only one assignment of trust deed made to the AUB. The district court held that the AUB was liable to Ms. Hill for $250,000, representing the amount of one trust deed assigned to Mr. Jenson as sole trustee of the AUB. Ms. Hill argues that the facts do not support this finding and that there were actually two assignments of trust deed executed on behalf of the AUB. The district court acknowledged that there were two assignments of trust deed, but it found that they were duplicates and "not two beneficial interests." In support of this conclusion, the district court stated that "in the language of the assignment AUB was to receive 100 payments of $2,500.00," and that the monthly payments actually made were only for $2,500, not the $5,000 that should have been paid if there were two assignments.

¶ 52 We review the district court's finding of fact for clear error. *State v. Levin,* 2006 UT 50, ¶ 20, 144 P.3d 1096. Upon review of the documents in the record, it is clear that there were two assignments of trust deed, not one.

¶ 53 The record contains two documents titled Assignment of Trust Deed. These assignments each reference separate underlying trust deeds, although both trust deeds are secured by the same parcel of real property. Both assignments were executed on December 12, 1990, and they both use Exhibit A to describe their terms. Exhibit A states that it is an attachment to "Assignment of Trust Deed (with reservations) recorded as Entry # 5001564 and Assignment of Trust Deed (with reservations) recorded as Entry # 5001565 executed this 12th day of December, 1990." Although Exhibit A states identical terms for both assignments, it is stating terms for two assignments of the right to collect on two different debts. The first assignment assigned an interest in a trust deed executed on December 5, 1989, securing a debt of $250,000. The second assignment assigned an interest in a trust deed executed on March 5, 1990, securing a debt of $175,000. The district court appears to have interpreted Exhibit A's application to both assignments as requiring only one monthly payment of $2,500 to cover both assignments. In fact, because Exhibit A is an attachment to both of the assignments, two monthly payments of $2,500 were required. Just because the attached terms of both assignments were identical does not undo their status as the assignment of two separate rights to be paid under two separate trust deeds. The AUB's March deposit

slip included in Ms. Hill's trial exhibit number fifty-five illustrates that this was in fact the case. It shows that two checks for $2,500 were received that month.

¶ 54 Because the assignments of trust deed reference distinct trust deeds and deposits were received representing two monthly payments of $2,500, it is clear that the district court erred in finding that there was only one assignment of trust deed.

## VI. THE DISTRICT COURT DID NOT ERR IN DECLINING TO ADDRESS THE THIRD–PARTY COMPLAINT

¶ 55 Defendants brought a cross-appeal alleging that the district court should have addressed a third-party complaint against Mr. Shugart and Mr. Jackson and should have apportioned some of the liability to them. The district court held that since Defendants did not pursue any of their claims against Mr. Shugart and Mr. Jackson, no liability should be apportioned to them.

¶ 56 To challenge the district court's finding of fact that the third-party complaint against Mr. Shugart was not pursued, Defendants must "marshal the evidence in support of the findings and then demonstrate that, despite this evidence, the trial court's findings are so lacking in support as to be against the clear weight of the evidence." *Gray v. Oxford Worldwide Group, Inc.*, 2006 UT App 241, ¶ 8, 139 P.3d 267.

¶ 57 In support of their claim that liability should have been apportioned to Mr. Shugart and Mr. Jackson, Defendants point out that they filed a third-party complaint against Mr. Shugart and Mr. Jackson in 1997. They also list several facts in the record that indicate that Mr. Shugart and Mr. Jackson were involved in transferring Ms. Hill's money to Mr. Matthews and Mr. Putvin. They do not, however, marshal the evidence in support of the district court's finding that the third-party complaint was not pursued. Specifically, they do not discuss Defendants' failure to mention the third-party complaint in their closing argument or Defendants' statement to the district court that Mr. Shugart is "forgiven and gone, from what we know." The evidence Defendants proffer in support

of their claim that Mr. Shugart and Mr. Jackson should be apportioned some of the liability does not demonstrate that the district court's finding was against the weight of the evidence. At most, the evidence they presented demonstrates that Mr. Shugart and Mr. Jackson made poor decisions regarding who to trust with Ms. Hill's money. The evidence presented does not demonstrate that Defendants pursued claims of civil conspiracy, conversion, money laundering, fraudulent misrepresentation, and intentional infliction of emotional distress against Mr. Shugart and Mr. Jackson.

¶ 58 Because the district court's finding that Defendants did not pursue the third-party claim is not against the weight of the evidence, we find that the district court did not abuse its discretion and affirm the holding of the district court.

## VII. THE DISTRICT COURT'S FINDINGS OF FACT WERE ADEQUATE

¶ 59 On cross-appeal, Defendants argue that the district court failed to make findings of fact and conclusions of law on their affirmative defenses six through nine, fifteen, twenty-two, twenty-six, and twenty-seven. "Failure of the trial court to make findings on all material issues is reversible error." *Romrell v. Zions First Nat'l Bank, N.A.*, 611 P.2d 392, 394–95 (Utah 1980).

> Although it is error for a court to fail to make findings on all material issues raised by the pleadings[,] this does not mean that the court must negative every allegation contained in the pleadings. It is sufficient if from the findings it makes there can be no reasonable inference other than that it must have found against such allegations.

*Patton v. Kirkman*, 109 Utah 487, 167 P.2d 282, 283 (1946).

¶ 60 The affirmative defenses on which Defendants allege the district court failed to make findings of fact and conclusions of law are the following: (a) Ms. Hill's complaint should be barred because she has unclean hands; (b) Ms. Hill's complaint should be barred because she brought the action in bad faith; (c) The racketeering claims and the

other claims are without merit; (d) Ms. Hill cannot recover because she participated in the illegal acts; (e) Ms. Hill's claims should be dismissed for failure to join indispensable parties; (f) Ms. Hill's claims should be dismissed because she has no personal knowledge of them; (g) Ms. Hill failed to allege a link or fiduciary relationship between herself and any of the defendants; and (h) Ms. Hill has failed to mitigate her damages.

¶ 61 The district court's award of damages to Ms. Hill for the conversion of her money can result in no conclusion other than that the district court found against Defendants on their affirmative defenses of unclean hands and bad faith. The district court addressed the racketeering issue at length; its refusal to award attorney fees under the Act implies that it found that Defendants were not the prevailing party. By finding that Ms. Hill could recover, the district court impliedly found that Ms. Hill had not participated in the illegal acts. Also, by allowing Ms. Hill's claims to proceed to trial, the district court also impliedly ruled on Defendants' affirmative defenses of failure to join an indispensable party and lack of personal knowledge of the claims. The district court's holding that Defendants made fraudulent misrepresentations to Ms. Hill can result in no conclusion but that there was a link between Ms. Hill and Defendants. Finally, the district court's award of the full amount of damages claimed requires that it found that Ms. Hill had no obligation to mitigate her damages. By making the findings that it did, the district court impliedly ruled on the affirmative defenses raised by Defendants.

¶ 62 Because the district court's findings support no inference other than that it found against Defendants' affirmative defenses, we find its findings of fact and conclusions of law were adequate.

## VIII. DEFENDANTS' CLAIM THAT THE AWARD OF PREJUDGMENT INTEREST WAS IN ERROR WAS NOT PRESERVED

¶ 63 Defendants argue that the district court erred in awarding Ms. Hill prejudgment interest because there was no contractual basis for Ms. Hill's damages.

¶ 64 "As a general rule, claims not raised before the trial court may not be raised on appeal." *State v. Cruz*, 2005 UT 45, ¶ 33, 122 P.3d 543 (internal quotation marks omitted).

¶ 65 Below, Defendants objected to the district court's award of prejudgment interest, but only on the grounds that the district court could not determine the amount of damages with specificity because it was unclear when Defendants had received the money or the amount of money actually received. Defendants never objected to application of the statute on the grounds that there was no underlying contract; therefore, Defendants failed to preserve their claim, and we will not address its merits.

## IX. THE DISTRICT COURT DID NOT ERR IN AWARDING PRINCIPAL DAMAGES OF $30,000 AGAINST THE AUB

¶ 66 Defendants argue that the district court incorrectly awarded principal damages against the AUB in the amount of $30,000. They allege that trial exhibit number sixty-three demonstrates that the AUB only received $20,000 and not the $30,000 found by the district court.

¶ 67 We will not set aside a lower court's findings of fact unless they are clearly erroneous. *Chen v. Stewart*, 2004 UT 82, ¶ 19, 100 P.3d 1177. "In order to establish that a particular finding of fact is clearly erroneous, an appellant must marshal the evidence in support of the findings and then demonstrate that despite this evidence, the trial court's findings are so lacking in support as to be against the clear weight of the evidence." *Id.* (internal quotation marks omitted).

¶ 68 Trial exhibit number sixty-three is the only piece of evidence Defendants provide to support their argument that the AUB did not receive $30,000 of Ms. Hill's money. They do not marshal the evidence that supported the district court's conclusion. On its own, the exhibit only shows that the AUB received a minimum of $20,000. Defendants fail to present any evidence that the extensive trial

record in this case does not support the district court's finding that the AUB received $30,000.

¶ 69 Because Defendants failed to marshal the evidence to show that the district court's holding was against the clear weight of the evidence, we affirm the district court's award of damages against the AUB.

## CONCLUSION

¶ 70 On Ms. Hill's appeal of the district court's holding that punitive damages could not be awarded because she had unclean hands, we hold that application of the equitable doctrine of unclean hands was in error when damages were not awarded based on equity and reverse the holding of the district court. On Ms. Hill's claim that the district court erred in apportioning damages, we hold that she failed to preserve the argument and that neither exceptional circumstances nor plain error excused this failure. On Ms. Hill's claim that the district court erred in holding that there was no pattern of unlawful activity under the Act, we hold that there was a pattern and reverse the holding of the district court. We also find that the district court did not err in denying Ms. Hill's rule 15(b) motion. On Ms. Hill's final issue, that the district court erred in holding that there was an assignment of only one trust deed, we hold that the district court clearly erred and that two trust deeds were assigned.

¶ 71 On Defendants' issues on cross-appeal, we find that the district court did not err in declining to address the third-party complaint and that its findings of fact and conclusions of law were adequate. We also find that Defendants failed to preserve their argument that prejudgment interest should not be awarded because there was no underlying contract and that they failed to marshal the evidence on their claim that the award of $30,000 in damages against the AUB was in error.

¶ 72 Based on our conclusions above, we remand this case to the district court for action consistent with this opinion.

¶ 73 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice WILKINS, and Justice PARRISH concur in Justice NEHRING'S opinion.